## J. EDWARD WEBSTER ET AL. *vs.* SUSQUEHANNA POLE LINE COMPANY.

*Eminent Domain—Existence of Right to Condemn May be Determined on Bill for Injunction, but Not the Necessity of Taking Certain Property—Supplying of Electric Power to All Persons a Public Use—Some Purposes of Corporation Public and Some Private—Condemnation of Fee in Part of Land and of Easement in Another Part—What Amendment of Charter of Public Service Corporation May be Made.*

The question whether a corporation, seeking to condemn property for its use under an inquisition, is legally vested with the power of eminent domain may be raised under a bill for an injunction to restrain the condemnation proceedings.

The supplying of electric power or energy to the public gen-
erally, on equal terms, is a public use, and a corporation
which supplies such power may be vested with the right of
eminent domain to condemn land for its line of poles and
wires.

The charter of a Pole Company declared that it was formed to
act as a common carrier of electric power or energy, and the
right was given to the public, whether individuals or corpora-
tions, to demand of the company without partiality all con-
nections and facilities, upon complying with reasonable regu-
lations and rates. *Held*, that the uses declared in the charter
are public uses; that the company is bound to supply electric-
ity at reasonable rates and without discrimination to all per-
sons desiring it to the extent of its capacity; that the com-
pany is subject to public regulation and control, and that it
is authorized, under Code, Art. 23, sec. 366, to acquire by
condemnation any property necessary for its purposes, either
in fee simple or for a less estate.

The fact that some of the purposes for which a corporation is
chartered are public and some are private, does not operate
to prevent it from acquiring property by condemnation for
its public uses, unless those uses are so combined with the
private purposes that the two cannot be separated.

The question whether the taking of certain land is necessary
for the public purposes of a corporation is one to be deter-
mined by the Court to which the inquisition is returned. It
is not to be decided upon a bill for an injunction to restrain
condemnation proceedings.

A Pole Company chartered to supply the public with electric
power and authorized by law to condemn property either in
fee simple or the use thereof in fee simple or for a less estate
is entitled to condemn certain land of a party in fee simple
for its ncessary purposes, and also an easement upon other
land of the party to cut, trim and remove trees and other ob-
structions therefrom.

A corporation which has condemned land for a public use in
pursuance of its charter cannot afterwards, by an amendment
of the charter, divest itself of the public use and then hold

the land for private purposes, since a public service corporation can be compelled by a mandamus to perform its public duties, and no such amendment of its charter could lawfully be made.

*Decided February 2nd, 1910.*

Appeal from the Circuit Court for Harford County (VAN BIBBER, J.).

The cause was argued before BOYD, C. J., BRISCOE, PEARCE, SCHMUCKER, BURKE, THOMAS, PATTISON and URNER, JJ.

*Wm. H. Harlan,* for the appellants.

*Fred. R. Williams and Francis T. Homer* (with whom were *George R. Willis* and *Stevenson A. Williams* on the brief), for the appellee.

PEARCE, J., delivered the opinion of the Court.

This is an appeal from an order of the Circuit Court for Harford County, as a Court of Equity, refusing to grant a preliminary injunction restraining proceedings by the defendants to condemn certain lands belonging to the plaintiffs, and dismissing the plaintiffs' bill. The appeal is brought under sec. 31 of Art. 5 of the Code authorizing an appeal at such a stage of the case, as held in *C. & P. Telephone Co. v. Baltimore City,* 89 Md. 689.

The principal defendant is a corporation, as appears from the copy of its charter filed with the bill as an exhibit, under the name of the Susquehanna Pole Line Company of Harford County, formed on August 13th, 1907, under sec. 28, class 13 of Article 23 of the Code of Public General Laws of Maryland. Its charter recites that it is formed "for construction, owning or operating telegraph or telephone lines in this State, and for the transaction of any business in which

electricity, either over or through wires may be applied to
any useful purpose, and especially to buy, sell, operate or
lease pole lines, erect poles, string wires thereon, or on poles
of other individuals or corporations on any and all streets,
avenues, highways and roads, public or private, and over and
under all canals and other waterways, and across any and all
bridges, and to use the same either for the transmission of
electric current for delivery to customers on such lines, or
for transmission of current to independent vendors thereof,
and for the transmission of current for any individuals or
corporations producing or delivering the same to said corpora-
tions, and to sell or lease to either individuals or corporations
the right to string electric wires on, or attach electric wires
to, any or all poles so erected, owned or leased and to use such
lines both as through lines and for local delivery, and to sell
or lease wires, cables or fixtures for the transmission and use
of electric current in any manner or form whatsoever, and
to manufacture and deal in any and all apparatus and things
required for, or capable of being used in connection with,
the transmission, delivery, and accumulation, and other em-
ployment of electric energy and current, or of electricity;
to build and construct and use for any of the purposes stated
above, underground subways or conduits, either under or
across any streets, avenues, highways, roads, canals and water-
ways, and to string electric wires, cables or conductors there-
in, and to buy or lease from or sell or let to any other individ-
ual or corporation, the right to string and use as aforesaid
electric wires, cables or conductors in such subways; to erect,
operate, maintain and either lease or let the sub-stations for
raising or lowering the voltage of any electricity received for
it for distribution over its lines, and for the accumulation,
storage, transmission and distribution of electric current, and
to purchase, lease, hire, buy, sell or deal in any and all ma-
chinery used therein or in connection therewith, or conven-
ient to its economical and practical operation; * * * and to
have the powers provided by section 366 of Art. 23 of the
Code of Public General Laws of 1904, together with such

other rights, powers and privileges, as are by the general laws granted to all corporations formed under the general incorporation Acts of the State of Maryland, and granted by any laws that may be particularly applicable to corporations formed under the class aforesaid."

In November, 1909, the defendant corporation amended its charter in the manner allowed and prescribed by law, by inserting after the clause which ends with the words "convenient to its economical and practical operation," the following clauses:

"To act as a common carrier of electrical power or energy by means of all appropriate or necessary structures, appliances, machinery, fixtures, devices, inventions or processes now or hereafter capable of being used in the transaction of any business wherein electricity or electric power or energy may at any time or place or in any manner be applied to any useful purpose.

"And the public in like situation with said Susquehanna Pole Line Company of Harford County, its successors and assigns, whether individuals, partnerships or corporations, are hereby vested with and entitled to a right to apply for and demand of the said Susquehanna Pole Line Company of Harford County, its successors and assigns, all connections and facilities without discrimination or partiality, to the extent of the just and reasonable distribution, transforming, carrying and connecting capacity and facilities of the said the Susquehanna Pole Line Company of Harford County, its successors and assigns, provided such applicant comply or offer to comply with all reasonable rules, regulations, terms and rates of said the Susquehanna Pole Line Company of Harford County its successors and assigns, and the said the Susquehanna Pole Line Company of Harford County, its successors and assigns, shall and must supply all applicants as aforesaid in like situation as aforeaid, who may exercise their said right, with such connection and facilities as aforesaid and to the extent and upon the condition aforesaid and the said the Susquehanna Pole Line Company of Harford

County, its successors and assigns, shall not impose any conditions or restrictions upon any such applicant that are not imposed impartially upon all persons, corporations or partnerships in like situation with it; and further the said Susquehanna Pole Line Company of Harford County shall not discriminate against any such applicant engaged in any lawful business or between any such applicants engaged in the same business by requiring as a condition, for furnishing such facilities aforesaid, that said facilities shall not be used in the business of said applicant or otherwise for any lawful purpose."

After alleging the foregoing, the bill further alleged that, "the particular business in which electricity over or through wires may be employed to any useful purpose which said defendant company purports to be transacting is the "transmission of electric power, energy or commerce, from the power house of the McCall Ferry Power Company a corporation incorporated under the laws of the Commonwealth of Pennsylvania, and which is constructing a hydro-electric plant for the generation of electric power or energy on the Susquehanna river at McCall's Ferry, in York and Lancaster Counties in said Commonwealth, to points of delivery to consumers within the State of Maryland.

"And the said defendant company purports to have contracted with said McCalls Ferry Power Company for the transmission of such electric power or energy so to be generated as aforesaid from the power house of said company to points in Pennsylvania and Maryland for delivery to consumers.

"And said defendant company is claiming that therefore it is engaged in interstate commerce between said States.""

And also alleged that on November 23, 1909, the defendant corporation professing to act under and in virtue of the aforesaid powers, and of those claimed to be conferred by Chapter 240 of 1908 amending and re-enacting section 366 of Article 23, took proceedings under sections 251. 252 of Art 23 relating to condemnation by railroad corporations, for

the condemnation of certain lands of the plaintiffs *in fee simple,* as authorized by Chapter 240 of 1908, together with an easement to cut, trim and remove all trees and other obstructions (upon other lands of the plaintiffs) which might interfere with or fall upon the land sought to be condemned in fee, but that said powers were absolutely *void ab initio* and the jury were without jurisdiction to find and return any inquisition in the premises.

1st. Because the proceedings are in conflict with Article 3, section 40 of the Constitution of Maryland which forbids the taking of private property for any other than a public use, and are also in conflict with the fifth amendment to the Constitution of the U. S. which declares that no person shall be deprived of life, liberty, or property without due process of law.

2nd. Because Article 23 of the Declaration of Rights of Maryland provides that no man ought to be disseized of his freehold liberties or privileges but by the law of the land; and 3rd, because the fourteenth amendment to the Constitution of the U. S. provides that no State shall deprive any person of life, liberty or property, without due process of law.

The bill prayed for a preliminary injunction against the said corporation and also against James A. Lyle, the justice of the peace who issued the warrant to summon the jury of inquisition, and Joseph E. Spencer, the sheriff of Harford County, to restrain them from any further proceeding pending a hearing of this case.

As both the appellant and the defendant corporation have in their briefs, stated certain facts almost in the same language, explanatory of the allusion of the bill to the McCalls Ferry Power Company, we shall abstract those statements from the brief of the appellee in order to exhibit more clearly than the record does, the relation of the appellee to that company.

"The appellee, together with a local corporation in York County, Pennsylvannia, and in Baltimore County, Mary-

land, has been engaged in purchasing lands or options in each of said counties for the purpose of constructing thereon, a continuous transmission or distribution line or lines of electric energy from a point on the Susquehanna river in York County, at McCalls Ferry about ten miles above Mason and Dixon's Line, through the counties of York, Harford and Baltimore, to Baltimore City and elsewhere in this State.

"At McCalls Ferry, the McCalls Ferry Power Company, a corporation of the Commonwealth of Pennsylvania, has nearly completed the construction of its dam across said river, and its hydro-electric generating plant, whereby it proposes to generate about 100,000 H. P. of electric energy, for sale and distribution to the public and consumers generally. The appellee and the local corporations aforesaid have contracted with said McCall Company, for the transmission of electric current about to be generated as aforesaid, to points of delivery in Pennsylvania and Maryland."

From this statement it is apparent that the appellee is a subsiduary corporation of the McCalls Ferry Power Company.

As the jurisdiction of the Court to entertain this bill is challenged by the appellee that question will be considered at once. We have seen that the bill charges that the powers under which the defendant claims to be acting are absolutely void *ab initio,* and that the said sheriff and jury are without jurisdiction to find and return any inquisition whatever, and this case comes up on appeal under Code, Article 5, section 31 upon the plaintiff's bill and exhibits, without answer, upon the order refusing the preliminary injunction. In *Western Md. R. R.* v. *Patterson,* 37 Md. 139, the true distinction in respect of jurisdiction by injunction in such cases, is stated to be "between the cases where the proceedings are void for want of authority, and where they are irregular and defective because of some omission or neglect which may be cured *pendente lite,* or taken advantage of whilst in *fieri,*" and it was there held "that in the former cases a Court of Equity had jurisdiction but in the latter it had none." In that case the

railroad company sought to condemn a fee simple and Patterson claimed the only power was to condemn an easement and the bill sought to arrest and restrain the proceedings before confirmation. The lower Court granted the injunction, but was reversed on appeal because, as the Court said: "There is no necessity for an injunction, where the Courts peculiarly vested with authority over the subject are competent to relieve and it is a sufficient ground for refusing it that the complainant has an ample remedy at law." In other words, that the *extent* to which the power of condemnation had been granted, and could be validly exercised by the railroad company, was a matter for the Court vested with the power of ratifying an inquisition taken under a power to exercise the right of eminent domain. In *Baltimore and Havre de Grace Turnpike Co.* v. *Union R. R. Co.*, 35 Md. 231, the latter corporation sought to condemn two crossings of the turnpike—one for the main branch of its railroad and one for a lateral road it proposed to build. The bill charged that the award of damages for both crossings was grossly inadequate and that the crossings would irreparably injure the plaintiff's franchises, and that the second crossing was *ultra vires.* The lower Court refused the injunction as to both crossings, but on appeal, this Court held that while the charter gave the power to condemn an easement for the main line, it gave no power to build a lateral line, and it therefore affirmed the decree as respected the main line crossing, but reversed it as to the crossing of the proposed lateral line, holding that the injunction should have issued as to that.

In *Page* v. *Mayor and City Council,* 34 Md. 565, Judge Grason said: "There is no doubt that where an ordinance is void, and its provisions are about to be enforced, any party whose interests are to be injuriously affected thereby, may, and properly ought to go into a Court of Equity and have the execution of the ordinance stayed by injunction."

Against these authorities, the appellee cites *Turnpike Co.* v. *N. C. R. R. Co.,* 15 Md. 198, as holding that want of power was a cause to be assigned against confirmation; but

Judge Tuck's language in that case shows clearly that it is not susceptible of that construction. What he said was, "no better cause could be assigned against the confirmation, than want of power to condemn the *particular property* proposed to be taken," thus distinguishing between the attempted exercise of a void power, and the application of a valid power to property not within the scope of the power. That we have here placed the proper construction upon the language of Judge Tuck, will appear from what was said in *C. & P. R. R. Co. & B. & O. R. R.* v. *Pa. R. R. Co.,* 57 Md. 275, where the Court refers to that case "as showing that the question of the power to condemn the *particular property* in controversy was exclusively a question for the confirming tribunal." In *Mayor & City Council* v. *Gill,.* 31 Md. 359, Judge Bartol said: "In this State the Courts have always maintained with jealous vigilance the restraints and limitations imposed by law upon the exercise of power by municipal and other corporations; and have not hesitated to exercise their rightful jurisdiction for the purpose of restraining them within the limits of their lawful authority, and of protecting the citizen from the consequence of their unauthorized or illegal acts."

We cannot therefore dismiss this bill for want of jurisdiction in the Circuit Court for Harford County.

The next and principal question in the case is, whether the taking of the appellant's property under the authority of section 366 of Article 23 of the Code as amended by Chapter 240 of the Acts of 1908, and under the provisions of the Charter of the appellee as hereinbefore set out, is a taking for a public use within the definition of that term adopted by this Court in the recent case of *Arnsperger* v. *Crawford,* 101 Md. 247, upon which case the appellants seem largely to rely in support of their contention that the proposed use is not a public use.

Section 366 of Article 23 gives to any corporation formed, as the appellee is, under class 13, section 28 of Article 23, the power "to acquire by condemnation any property right

whatsoever necessary for its purposes in its discretion, either
in fee simple, or the use thereof in fee simple, or for a
less estate" either in the manner prescribed in sections 251
and 252 or in sections 360 to 365 of that article.

But notwithstanding these broad provisions, the power con-
ferred can only be exercised for a public use as above defined,
because the constitution forbids the taking of private prop-
erty for a private use, and the Legislature cannot make a
private use, public, by declaring it to be such, or by author-
izing the exercise of the power of eminent domain for any
use which the Courts may determine not to be a public use.
The exact subject-matter determined in the *Arnsperger Case,
supra,* was that land cannot be constitutionally condemned
for a *private road for the use of particular individuals, who
may lawfully exclude the public therefrom,* and in so de-
termining, it was held, in accordance with what we deemed
to be the best authorities, that "the test whether a use is
public or not, is whether a public trust is imposed on the
property; whether the public has a legal right to the use,
which cannot be gainsaid or denied, or withdrawn at the
pleasure of the owner," and that "the expressions, public *in-
terest* and public use are not synonomous." The amended
Charter of the appellee was obviously adopted for the purpose
of removing any question whether the original charter meas-
ured up to that test, and in the belief that the amended
charter accomplished that purpose, and it will therefore be
necessary to consider only the latter amended charter.

It specifically declares the corporation to be formed "to act
as a *common carrier* of electrical power or energy by means of
all appropriate or necessary structures-appliances, devices,
or processes, now or hereafter capable of being used in the
transaction of any business wherein electricity or electric
power or energy may be applied to any useful purpose," and
it expressly "vests" in "the public in like situation with said
Susquehanna Pole Line Company of Harford County, its
successors and assigns, whether individuals, partnerships or
corporations, a *right,* to apply for and demand of said com-

pany, all connections and facilities without discrimination or partiality to the extent of the just and reasonable distributing, transforming, carrying and connecting capacity and facilities of said company." It declares that said company "shall and must supply all applicants in like situation as aforesaid, who may exercise said right with the connections and facilities aforesaid, provided such applicants comply or offer to comply with all *reasonable* rules, regulations, terms and rates of said company;" and it declares that said company shall not impose any conditions or restrictions upon any such applicant not imposed impartially upon all other persons, partnerships or corporations in like situation; and that said company shall not discriminate against any such applicant or between any such applicants, engaged in any lawful business, by requiring as a condition for furnishing such facilities that the same shall not be used in the business of said applicant, or otherwise for any lawful purpose."

The language of the amended charter as given above is not that of the appellee's counsel, and as such subject to the possible suspicion that it was chosen in the interest of the appellee rather than that of the public; but it is the language of the Legislature of the State, to be found in section 336 of Article 23, and employed by it deliberately to indicate that the operation of a telephone company is a *"public employment* and that the instruments and appliances used are property devoted to public use, and in which the public have an interest." *C. & P. Telephone Co.* v. *B. & O. Tel. Co.,* 66 Md. 415. It is therefore not only appropriate language in itself to declare and impose a public duty, but it has legislative sanction for its employment for that purpose. In the case just cited CHIEF JUDGE ALVEY said: "It is the nature of the service undertaken to be performed that creates the duty to the public, and in which the public have an interest, and not simply the body that may be invested with the power." It is not essential, as contended by the appellant that there should be "a pre-enacted legislative regulation" such as section 336 provided for telephone companies. In

*Rockingham Light and Power Co.* v. *Hobbs,* 72 N. H. 531 (66 L. R. A. 585-6), the Court said: "If the plaintiff is under obligation to supply electricity or electric energy at reasonable rates, and without discrimination, to all corporations, public, *quasi* public and private, and to all persons desiring it, who are located within reasonable distances of the plaintiff's lines so far as the extent and capacity of its works will permit, it appears to have all the characteristics of a *quasi* public corporation. * * * The delegation of the power of eminent domain to a corporation is not always accompanied with an express imposition of the obligation to serve the public reasonably and equitably. A corporation, by the acceptance and exercise of the power impliedly undertakes such service respecting the subject for which the power is exercised. *Lombard* v. *Stearns,* 4 Cush. 60; *Trenton & N. B. Turnpike Co.* v. *American Commercial News Co.,* 43 N. J. L. 381."

So in *Brown* v. *Gerald,* 100 Maine, 372, it was said: "It is generally well settled now that when the Legislature grants to a corporation the right of eminent domain, or public rights, like street rights for public uses, and the corporation accepts and exercises the grant, it thereby impliedly comes under obligation to the public to perform all those duties in which the public are interested, and to aid in the performance of which the right of eminent domain was granted. *It can be compelled to perform them, and at reasonable rates.* It subjects itself to public regulation and control, and to forfeiture of its charter for failure to perform." In the case now before us the appellee has written into its charter the obligation to the public to perform all those duties in which the public is interested, and this charter being granted under the general law of incorporation, that obligation is as much a part of its organic life, as if contained in a legislative charter directly to the appellee. But unless the grant was for public uses, the appellee cannot, either impliedly by acceptance of the grant, or by incorporating obligations into its charter, come under any obligation to the public or obtain any rights as a

public instrumentality. The ultimate question is, and must be, whether the uses declared in the charter are in law public uses.

Mr. Lewis in his work on Eminent Domain, section 173 says: "The condemnation of property for public sewers, or works for the disposition of sewage, or for supplying a city or town with water or gas, is so manifestly a public use that it has been seldom questioned and never denied." And in section 160 he says: "In determining whether the use is public or not, it is an immaterial consideration that the control of the property is vested in private persons who are actuated solely by motives of private gain. Railroads, canals, turnpikes and ferries are familiar instances of such appropriation, and the principle is of universal application. 'The inquiry must necessarily be, what are the objects to be accomplished, not, who are the instruments for attaining them.'" Nor need the use be for the whole public. "It may be for the inhabitants of a small or restricted locality; but the use and benefit must be in common, not to particular individuals or estates." *Idem,* sec. 161. Mr. Joyce, in his work on Electric Law, sec. 277, says: "The planting of poles and stringing of wires for the purpose of street lighting, *and supplying* light to citizens, is one of the uses to which the streets of a city may be devoted, and is a public use.

In *State, ex rel.* v. *Toledo,* 48 Ohio St. 113,, it was held that the supplying of municipal corporations and their citizens with natural gas, is a public use or purpose for which the taxing power may be constitutionally exercised; and in the course of the opinion the Court observed that though that was a case of taxation and not of eminent domain, yet it was to be considered upon the principles governing eminent domain. If supplying the public with water or gas is so manifestly a public use as not to be questioned, upon what just principle can it be held that supplying the public with electric light is not a public use? In *Brown* v. *Gerald,* 100 Maine, the defendant was empowered to generate, sell, distribute and supply electricity for lighting, heating and man-

ufacturing purposes in certain towns, and to take by the exercise of the right of eminent domain, land for the establishment of its plant, which the Court held embraced its line of poles and wires. The case was for an injunction to restrain the erection of the line across the plaintiff's farm. The defendant contended that it had the right to take the plaintiff's land for the purpose of furnishing an electric current for lights, whether it could do so for supplying power for manufacturing purposes or not. The Court said: "We think it should be conceded that the taking of land for the purpose of supplying the public, or so much of the public as wishes it, with electric lighting, is for a public use," and also held, that "if the company exercised the right actually for lighting purposes, it might also use the property thus obtained for other incidental purposes, as has been many times held." But the Court found under the testimony taken in the case that the land was being taken to enable the company to deliver electrical power to a manufacturing company *under a contract,* and that the alleged public use was a mere cover for a private enterprise, and the injunction was for *that reason only,* sustained.

In *Walker* v. *Shasta Power Co.,* 160 Fed. Rep. 856, the Court said: "It has been generally held by the Courts that the generation of electric power for distribution and sale to the public on equal terms, is a public enterprise." And in *Minnesota Canal and Power Co.* v. *Koochiching Co.,* 97 Minn. 429, it was said: "Electric lighting is universally recognized as a public enterprise, in aid of which the right of eminent domain may be invoked." And in *Canal Power Co.* v. *Pratt,* 101 Minn. 212, it was held that the term "public business" includes the construction of works for supplying the public with light, heat and power.

In *New Central Coal Co.* v. *Georges Creek Co.,* 37 Md. 563, it was held through CHIEF JUDGE ALVEY, that the Legislature may authorize the condemnation of private property by a mining company for the construction of a railroad to bring coal from its mines, "such use being of a public

nature." And in *N. Y. Mining Co.* v. *Midland Co.,* 99 Md. that decision was confirmed, CHIEF JUDGE McSHERRY saying that a mining company could condemn land for the construction of a connecting railroad, though it had no motive power of its own, and he pointed out that such use was a public use, for the reason, among others, "that other railroad companies or mining companies would have the right to run over it and to use it in the method prescribed by the statute." The Courts of Pennsylvania, as observed by JUDGE ALVEY in *New Central Coal Co.'s Case, supra,* have very fully sustained "the right to take by compulsory process, land for the construction of lateral railways to coal mines, as being for public use, and therefore within the power of the eminent domain," and this notwithstanding that the test for determining a public use which we adopted in the *Arnsperger Case,* 101 Md., was the test applied in *Farmers Market Co.* v. *P. & R. R. R. Co.,* 142 Pa. St. 586, upon which case the *Arnsperger Case* largely was determined. Even in the cases cited in the appellant's brief as against the validity of the power in this case, there are to be found expressions going far to sustain the view that the supplying of electric light, heat or power to the public, is a public use. Thus in *Fallsburg* v. *Alexander,* 101 Va. 110, the Court held that the interest of the public, if any, under the language of the charter was too vague and indefinite to support the power of eminent domain, but also said: "We do not mean to say however that under no conditions can the right of eminent domain be conferred by the Legislature in furtherance of the establishment of plants for the generation of electric power, or other power, light or heat, where public necessity requires it and the public use is apparently safely guarded. To meet industrial progress, new conditions, and the ever increasing necessities of society, the Courts have gone very far in sustaining legislation conferring the franchise of eminent domain, and it is not necessary for us in this case, if we were

so inclined, to question the soundness of the policy sustained in those decisions."

We think that the language of the appellee's amended charter amply safeguards the right of the public to the use of the electric current to be conveyed over the pole line, and that we are well within the principles laid down in the *Arnsperger Case* in holding that the right of eminent domain may be exercised by the appellee for the purposes indicated in its amended charter.

But it is further contended by the appellant that some of the purposes of the appellee as set forth in its charter cannot be held to be public uses, and therefore the power of eminent domain cannot be exercised at all.

But this is only when a private use is combined with a public use in such a way that the two cannot be separated. 1 *Lewis on Eminent Domain,* sec. 206. The case of *Harlan v. Centralia Elec. Power Co.,* 42 Wash. 633, states what we deem to be the true doctrine in this respect. There the Court said: "The objects for which the corporation was formed, as recited in its articles, are many and somewhat varied, and those of a public and *quasi* public nature are commingled with those that are purely private. * * * The relator contends therefore, to permit it to condemn property at all, is to permit private property to be taken for a private use. There are cases which maintain the doctrine that a statute authorizing the condemnation of property for uses, a part of which only are of a public nature is in violation of the rule that private property cannot be taken for private use, and hence cannot be enforced. * * * If a private use is combined with a public one in such a way that the two cannot be separated, then, unquestionably, the right of eminent domain could not be invoked to aid the enterprise, but it has been said, and it seems to us that it is the better reason, that where the two are not so combined as to be inseparable, the good may be separated from the bad, and the right exercised for the uses that are public. * * * While the exercise of the right of eminent domain must be guarded jealously so that the

private property of one person may not be taken for the private use of another, after all is said and done, the power to prevent property taken for a public use from being subsequently devoted to a private use must rest rather in the supervisory control of the State, than in caution in permitting the exercise of the power. Property taken for a public use by a corporation organized solely to promote a public business, may be as easily diverted by it to a private use as it may by one having both private and public objects."

And in *The Lake Koen Nav. Co.* v. *Klein,* 63 Kan. 485, it was said: "We see no greater reason for denying to a private corporation the power of eminent domain for the promotion of a public use, because by its charter it is also authorized to engage in a private enterprise, than to deny to a private person the same power, because he is inherently endowed with the same authority."

But it is further contended by the appellant, that there is no provision of law for determining the *necessity* of the taking, either by the jury of inquisition or by a Court of competent jurisdiction, and the taking therefore is without due process of law, both under the Constitution of the State, and the Fourteenth Amendment to the Constitution of the United States. But in *New Central Coal Co.* v. *George's Creek Coal Co.,* 37 Md. 565, speaking of the necessity of the taking the Court said: "It is proper that these questions be referred exclusively to the Court specially clothed with jurisdiction and power to pass on the propriety of the inquisition of condemnation;" and in *N. Y. Mining Co.* v. *Midland Co.,* 99 Md. 513, JUDGE McSHERRY said: "There could be no more conclusive reason for refusing to confirm the inquisition than the non-existence of a necessity for an acquisition of the land sought to be condemned. Whether such a necessity did in point of fact exist, was obviously a question for the Court below to determine upon the objections filed before the inquisition could be confirmed." The case before us has not reached a stage for the consideration of that question. As was said in *New Central Coal Co.'s Case, supra:* "In the

delegation of the power is implied the condition that it shall only be exercised when, and to the extent actually found necessary. This rule however, may, and generally does involve questions of engineering and other questions that a Court of Equity cannot undertake to determine."

Again, it is contended that the appellee, even if it has a valid power of eminent domain under section 366 of Article 23, cannot take both a fee simple, or the use in fee simple, of the parcel described in the application and warrant, and also an easement to cut and trim trees and other obstructions which may fall upon or interfere with the use of said parcel of land, for the reason that the language of section 366 is in the disjunctive, "the use thereof in fee simple, *or* for a less estate." We cannot adopt so narrow and strained a construction. To compel the appellee to condemn the use in fee simple of *the whole,* when the use in fee simple of *part,* together with an easement in adjoining land would be ample, would be an arbitrary and unreasonable construction to impose upon the language of the law. It cannot be doubted that if the appellee had only asked for the use in fee of the parcel described, and after occuping it had discovered that it was necessary to have the right to cut and trim trees and bushes interfering with the use and occupation of the parcel first taken, that it could have a second inquisition for that purpose; and there can be no reason why it should not be allowed to take in one proceeding, upon proof of necessity, what it could take in two proceedings.

Finally it is contended that under the general and unrestricted power of amendment given to corporations organized under the general law, the appellee could, after acquiring the appellant's property, for the public uses which we have said are imposed upon it, under its amended charter, divest itself of such public uses, merely by another amendment, repealing or striking out all the provisions of the original amendment, with the result that it would then hold for private uses, property condemned for a public use.

But this result cannot be accomplished under the law.

We have said that the appellee is a *public service* corporation. Section 51 of Article 23, as amended by the Act of 1908 while permitting corporations in general to apply for voluntary dissolution, expressly withholds this power from *public service corporations,* and it can require no argument to show that such a corporation could not by amendment, accomplish what it could not do by attempted dissolution. By that provision of the law the State declared its purpose to retain absolute control over public service corporations and to forbid them, by any method or device, to divest themselves of their duties and obligations to the public. The State could for proper cause forfeit the charter of a public service corporation, but its power is just as clear to control its conduct as such, and to compel by mandamus the performance of its public duties. *C. & P. Telephone Co.* v. *B. & O. Tel. Co.,* 66 Md. 419.

But it would be an injustice to assume that the appellee would attempt to do what the law forbids.

In *McMeekin* v. *Central Carolina Power Co.,* 80 S. C. 512, the Court said: "The language of section 5 of the Act plainly imposes upon the defendant a public duty and the petition assumes that the defendant will not comply with the requirements of the statute. It would be prejudging the case to decide that question at this time." And the same is substantially held in *Brown* v. *Gerald,* 100 Maine, 372, and in *Rockingham County L. & P. Co.* v. *Hobbs,* 66 L. R. A. 586. In the latter case the company's charter had been amended, as in this case, with a view to a clearer imposition of a public use upon the property proposed to be taken, and the Court, after saying that the public thereby acquired a right to the service of the corporation upon equal and reasonable terms, said further: "In addition to the plaintiff's duty in this regard the Legislature have power to control the plaintiff in its dealings with the public * * * and this furnishes additional assurance that corporations engaged in the

public service, as well as other corporations, shall perform their duties to the satisfaction of the public."

In this State all charters granted or adopted since the Constitution of 1867 may be altered from time to time and repealed at the pleasure of the Legislature, and any corporation may forfeit its charter by non-user or misuser of its franchises.

In any such case where the *use* in fee had been condemned as authorized by the statute, there are not wanting authorities of high character holding that this should be treated as a qualified fee simple determinable when the public use ceases, and that the land would revert if the company ceased to use it for the purposes for which it was taken, or upon forfeiture of the company's charter. 1 *Lewis on Eminent Domain,* section 278. *The People* v. *White,* 11 Barb. 28; *Hooker* v. *Utica Turnpike Co.,* 12 Wend. 371; *Raleigh R. R.* v. *Davis,* 2 Devereaux & Battle, 467. But that question does not properly arise in this case, and we are not to be understood as deciding it or attempting to decide it, in advance of its presentation.

It results from what we have said, that none of the constitutional objections made by the appellants can be maintained, and the decree refusing the injunction and dismissing the bill must be affirmed.

> *Decree affirmed, costs above and below to be paid by the appellants.*